IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

BRANDIE D. MARTIN PLAINTIFF

V. NO. 1:07cv00056 JWC

MICHAEL J. ASTRUE, DEFENDANT
Commissioner, Social
Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff, Brandie D. Martin, seeks judicial review of the denial of her claim for a period of disability and disability insurance benefits and supplemental security income (SSI) benefits. Both parties have submitted briefs (doc. 9, 10).

For the reasons that follow, the Court[1] **affirms** the Commissioner's decision that Plaintiff is not disabled within the meaning of the Social Security Act and regulations and, therefore, is not entitled to disability insurance benefits or SSI benefits.

I.

The Commissioner's denial of benefits must be upheld upon judicial review if the decision is supported by substantial evidence in the record as a whole. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009); *see* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Wiese*, 552 F.3d at 730. In its review, the Court should consider evidence supporting the Commissioner's decision as well as evidence

[1]The parties have consented to the jurisdiction of the United States Magistrate Judge (doc. 7).

detracting from it. *Id.* That the Court would have reached a different conclusion is not a sufficient basis for reversal; rather, if it is possible to draw two inconsistent conclusions from the evidence and one of these conclusions represents the Commissioner's findings, the denial of benefits must be affirmed. *Id.*

II.

In her application documents and at the hearing before the ALJ, Plaintiff alleged inability to work since February 1, 2004, due to diabetes mellitus, bipolar disorder, anxiety disorder, kidney infections, endometriosis, neuropathy, and pain in her back, legs, feet and hands. (Tr. 35, 40, 60, 64, 74, 76, 101, 519, 521, 524, 526, 528-30.) Plaintiff was twenty-seven years old at the time of the hearing, has a high school education, and was single and living with her two young children. (Tr. 519-20.) She has past work as a certified nursing assistant (CNA) at a nursing home (1999 to 2003). (Tr. 86, 520.)

Under the applicable law, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The regulations provide a five-step sequential process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Basically, those procedures require the ALJ to take into account whether a claimant is working, whether the claimant's physical or mental impairments are severe, whether the impairments meet or equal an impairment

listed in the regulations, whether the impairments prevent a resumption of work done in the past, and whether they preclude any other type of work. *Id.*

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. The ALJ next determined, at step two, that Plaintiff suffered from severe impairments of type I diabetes mellitus, panic attacks, depression, anxiety, attention deficit hyperactivity disorder, substance abuse, and gastritis, but that none of her impairments, individually or in combination, equaled a step-three listed impairment as contained in the regulations. The ALJ next determined that Plaintiff retained the residual functional capacity (RFC) to perform medium work with moderate limitations in social functioning and concentration, persistence and pace, which did not preclude her past work as a CNA. The ALJ thus found that Plaintiff could perform her past relevant work and was not disabled, ending his analysis at step four. (Tr. 14-20.) Plaintiff pursued administrative review with no success, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-8.)

Plaintiff argues (doc. 9, at 2) that the ALJ erred (1) in failing to consider her impairments in combination, (2) in failing to give proper consideration to her subjective complaints of pain, (3) in finding she had the RFC to perform her past relevant work, and (4) in disregarding the opinions of her primary treating physicians.

III.

First, Plaintiff argues that the ALJ “fragmentized” her impairments and failed to consider them in combination.

In his decision, the ALJ correctly stated that he had to consider, at step two of the sequential process, whether Plaintiff had a severe impairment or a "combination of impairments" that was severe, and, at step three, whether Plaintiff's impairment or "combination of impairments" meets or medically equals the criteria of a listing. (Tr. 15.) He also correctly stated that he had to consider, in assessing Plaintiff's RFC at step four, "all of [her] impairments, including impairments that are not severe." (Tr. 15.) He specifically found that Plaintiff "does not have an impairment or combination of impairments" that meets or medically equals a listed impairment. (Tr. 16, 17.) He also stated that he was considering "all the evidence," "the entire record" and the "record as a whole" in making his findings, including his RFC determination. (Tr. 14, 16, 17, 19.) He discussed the medical evidence regarding Plaintiff's physical and mental impairments. (Tr. 17, 18-19.)

This record is sufficient to demonstrate that the ALJ considered Plaintiff's impairments in combination, as required by the regulations and other relevant authority. *See* 20 C.F.R. §§ 404.1523, 404.1526(b)(3), 404.1545(a)(2), 416.923, 416.926(b)(3), 416.945(a)(2); *Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994) (where ALJ found claimant did not have impairment or combination equaling listing-level impairment and referred to evidence as a whole, ALJ properly considered combined effect of impairments).

IV.

Plaintiff next argues that the ALJ failed to discuss her pain in any detail and erred in discrediting her subjective complaints, *i.e.*, her inability to stand for more than fifteen minutes, her need for frequent breaks to attend to her medical needs, her pain and fatigue,

and her frequent absences, all of which are substantiated by her primary treating physicians and are not refuted in the record.[2]

A claimant's subjective complaints may be discounted if they are inconsistent with the evidence as a whole. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007). The ALJ is in the best position to gauge credibility and is granted deference in that regard as long as he explicitly discredits a claimant's subjective testimony and gives good reasons for doing so. *Id.* at 695-96. The Social Security regulations and rulings identify a number of factors for the ALJ to consider in assessing credibility, most of which were set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). *See* 20 C.F.R. §§ 404.1529(c), 416.929(c);[3] Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *3, *5 (S.S.A. 1996). However, an ALJ need only acknowledge and consider these factors, and need not explicitly discuss each one. *Casey*, 503 F.3d at 695. Nor is an ALJ required to discuss all of the evidence submitted, and his failure to cite specific evidence does not mean that it was not considered. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

Here, the ALJ stated that he had evaluated Plaintiff's statements and alleged symptoms "based on a consideration of the entire case record" and utilizing the criteria of the relevant regulations and rulings. (Tr. 17.) He acknowledged Plaintiff's allegations that

---

[2]Plaintiff does not specifically challenge the ALJ's findings regarding her mental limitations; therefore, the related medical history is not recited here unless otherwise relevant.

[3]As stated in this regulation, the ALJ is required to consider, in addition to the objective medical evidence and the claimant's prior work record, statements and observations made by the claimant, his or her medical providers and any others regarding (1) the claimant's daily activities, (2) the location, duration, frequency and intensity of pain or other symptoms, (3) precipitating and aggravating factors, (4) type, dosage, effectiveness and side effects of medications, (5) non-medication treatments or other measures taken to alleviate pain and symptoms, and (6) functional limitations.

she was unable to work in any job due to her impairments (Tr. 18) and that she could stand for only ten to fifteen minutes and walk for about 100 yards (Tr. 19). Listing the applicable factors, he found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." (Tr. 18.) He gave several reasons for his credibility determination (Tr.18-19): (1) the lack of objective medical findings to support a disabling level of pain and other symptoms; (2) Plaintiff's noncompliance with prescribed treatment for her diabetes; (3) her failure to acknowledge drug and alcohol abuse; (4) a history of malingering; (5) the fact that no physician had placed limitations on her to the extent alleged; and (6) the extent of her daily activities.

First, the ALJ accurately and appropriately noted that Plaintiff had a history of insulin-dependent diabetes mellitus, but no ongoing treatment for retinopathy, neuropathy, or kidney disease, and that no physician had limited her standing and walking to the extent alleged. (Tr. 18, 19.) *See Juszczyk v. Astrue*, 542 F.3d 626, 631-32 (8th Cir. 2008) (adverse credibility determination supported by lack of objective medical and clinical evidence to support alleged depth and severity of physical impairments); *Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005) (proper to discount allegations of disabling pain due to lack of corroborating medical evidence); *Baldwin v. Barnhart*, 349 F.3d 549, 557 (8th Cir. 2003) (none of claimant's physicians restricted or limited his activities).

Additionally, as observed by the ALJ (Tr. 18-19) and supported by substantial evidence in the record, Plaintiff has not been compliant with the prescribed treatment plan for controlling her diabetes, either by failing to take her insulin regularly and as prescribed, by failing to check her blood sugar regularly, or by triggering diabetic complications through the use of non-prescribed or illicit drugs or alcohol.

On September 23, 2003, Plaintiff sought medical treatment for "nerves" and social and marital stress. It was noted that Plaintiff had not monitored her blood sugar in several days, was having vomiting spells, and had taken a friend's Xanax and some Valium. She was encouraged to watch her diet and check her blood sugar four times a day. (Tr. 121.)

On October 7, 2004, her endocrinologist, Dr. Kevin Ganong, noted that, despite twice-daily insulin treatments, Plaintiff's blood glucoses were high and she was checking her blood sugar only three to four times per week. He prescribed more aggressive insulin treatment, gave her a new glucose meter, and asked her to check her blood sugar at least three times per day. (Tr. 139-42.) A month later, on November 8, 2004, she returned to Dr. Ganong for follow-up. He stated that she was not taking her NovoLog as directed despite written instructions, was checking her blood sugar "just a couple of times per day at home," and her diabetes was thus "uncontrolled." He again gave Plaintiff written instructions and went over them carefully with her and a friend, who was going to help her remember. (Tr. 137-38.)

In January 2005, Plaintiff underwent incision and drainage of a right thigh abscess. (Tr. 367-84 .) At that time, it was noted that she had "poor control" of her diabetes and she was referred for an internal medicine consult regarding diabetic teaching. (Tr. 367, 372-73, 375.)

In May 2005, she was hospitalized for severe nausea and vomiting, but the record contains no discharge report for this stay and does not indicate whether her symptoms were related to diabetes. (Tr. 351-60.) In June 2005, she presented to the hospital ER and was admitted and treated for pyelonephritis, or kidney inflammation. (Tr. 336-50.)

Plaintiff was hospitalized again from July 17 to 21, 2005. (Tr. 302-04, 317-35.) She presented upon admission with nausea/vomiting and epigastric pain. She admitted that she was "not a terribly compliant diabetic" and had, the night before, "partied and smoked a joint of some sort" and did not take her evening dose of insulin. (Tr. 319.) A urine drug screen was positive for amphetamines. (Tr. 320, 331-32.) During her stay, her ketones were cleared and her blood sugar was brought under control. The discharge diagnoses were diabetic ketoacidosis, gastritis with probable gastroparesis, and methamphetamine abuse. (Tr. 318.)

On November 2, 2005, Plaintiff sought treatment from her primary care physician, Dr. L.G. Moody, for a rib fracture and pain, foot and hand pain, and concerns about diabetic neuropathy. Her blood sugar was "greater than [the] machine will record," and Dr. Moody said her diabetes was "out of control." She reported that she had not taken her insulin that day and did not check her blood sugar daily because she could not afford to buy strips. The treatment notes state that she was lectured about the importance of checking her blood sugar and was advised to discontinue smoking and buy testing strips instead, but "patient [was] not interested." (Tr. 429-30.) Dr. Moody again noted, on November 18, that her diabetes was "out of control" (Tr. 428), and on December 9, stated that she had "poor control" (Tr. 426).

She was next hospitalized from January 10 to 12, 2006, for complaints of abdominal pain, back pain, nausea and vomiting. (Tr. 244-80, 288-90.) She was found to be in diabetic ketoacidosis. (Tr. 249.) Although she denied alcohol or illicit drug use, her husband reported that she had drunk a fifth of whiskey two nights earlier, and family-members said they "suspected meth and alcohol use last night." (Tr. 249, 262.) A urine

drug screen was positive for barbituates and amphetamines. (Tr. 245, 273, 276-77.) The attending physician noted that alcohol abuse in combination with her medications might have triggered her nausea and vomiting. (Tr. 250.) Plaintiff was stabilized during her stay, and was counseled about the need for better blood sugar control and cessation of drug and alcohol abuse. The discharge diagnoses were diabetic ketoacidosis, urinary tract infection, insulin-dependent diabetes mellitus, and drug abuse. (Tr. 245.)

On March 13, 2006, Plaintiff was admitted to the hospital with nausea, vomiting and stomach cramps. (Tr. 185-243.) On admission, she was assessed with "mild" diabetic ketosis, chronic pain, "intolerance of p.o."[4] and a probable urinary tract infection. It was noted that her "history of stimulant use" could contribute to her conditions. (Tr. 194.) A urine drug screen was positive for phencyclidine (PCP), but this could not be confirmed and was not mentioned in any treatment notes. (Tr. 230, 232.) She was treated and discharged on March 17, with the attending physician noting that she had "chronic pain and multiple behavioral/psychiatric comorbidities." (Tr. 186.)

In an office visit in April 2006, Dr. Moody found "much improved control" of Plaintiff's diabetes. (Tr. 419-20.) In June 2006, she presented to the ER with back pain, nausea and vomiting, and was admitted and treated for mild-to-moderate diabetic ketoacidosis with a presumed recent urinary tract infection. (Tr. 512-13.)

On June 22, 2006, Plaintiff began seeing a new primary care physician, Robin C. Williams, M.D., for diabetes monitoring, depression, gastroesophageal reflux (GERD), and a urinary tract infection, (Tr. 511) with a second visit on August 4 (Tr. 508).

---

[4] P.O. means "by mouth."

On September 1, 2006, she sought treatment in the ER for back pain, fever, nausea and vomiting. She was admitted and diagnosed with a urinary tract infection, “poorly controlled” diabetes and chronic low back pain; her conditions were treated; and she was discharged in good condition on September 5. (Tr. 498-507.) She followed up with Dr. Williams on September 12 (Tr. 497), then sought treatment from her again on October 16, November 17, and December 21, 2006, with complaints of pain in her back, shoulder, feet, hands, tingling or numbness, and depression. (Tr. 491-93.)

The record contains many other references to substance misuse or abuse. (*See* Tr. 107 [8/31/04 notation that social services is “investigating drug/substance abuse (street & prescription)”]; 110 [9/03/04 notation that patient “almost demands pain pills – specifically Vicodin”]; 152 [7/02/04 notation that two callers reported Plaintiff “to be selling Klonopin”]; 156 [4/29/04 notation that “pt is not to take friend’s Xanax”]; 161 [4/28/04 report by Plaintiff that she last used meth 4-5 years ago and “smokes [pot] pretty frequently”]; 167 [4/28/04 report that doctors were reluctant to prescribe Xanax and Plaintiff said “she would get some anyway,” which was advised as “unwise”]; 433-34 [7/27/05 notation of “picking @ feet used meth before?” and physician assessment of “drug abuse”]).

At the hearing before the ALJ on January 5, 2007, Plaintiff testified that the last time she used drugs or alcohol was “years ago.” (Tr. 533.) When asked about the positive drug screening result from January 2006, she said she did not know anything about it. (Tr. 533-34.) She later admitted that she took some pain pills that were not her prescription (Tr. 537, 544-45) and that she used to take caffeine “stackers” (Tr. 537). She also testified that she had never been arrested for any kind of illicit drug use and had never sold prescription drugs. (Tr. 544-46.)

Although the medical records document Plaintiff's ongoing difficulties from 2003 to 2006 with controlling her diabetes and related complications, the evidence set forth above clearly links most of her diabetic ketoacidosis episodes with her noncompliance with prescribed treatment or with her continued use of drugs and alcohol.

The regulations provide that failure to follow a prescribed course of treatment without good reason precludes a finding of disability. 20 C.F.R. §§ 404.1530(a-b), 416.930(a-b). Furthermore, a condition that can be controlled by treatment or medication cannot be considered disabling. *Schultz v. Barnhart*, 479 F.3d 979, 983 (8th Cir. 2007). Plaintiff's brief acknowledges that she may be able to function in the workplace at some point with proper training, treatment and accommodations, but that she could not do so during the period in question (doc. 9, at 11-12). It is her burden to establish disability during the relevant time period, and the record as set forth above fails to demonstrate that she suffered from a disabling condition during that time period that could not have been controlled if she had complied with the instructions of her medical providers.

Additionally, noncompliance with a physician's directions or prescribed treatment is a valid reason to discredit a claimant's subjective allegations, *see Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006); as is evidence of misuse or abuse of drugs and alcohol. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (physician's concern that a claimant is becoming addicted to narcotic medication can provide a basis for disbelieving the severity of the claimant's complaints of pain); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (claimant's misuse of medications is a valid factor in ALJ's credibility determination).

In light of the record evidence set forth above, the ALJ was justified in finding that Plaintiff's "failure to acknowledge drug and alcohol abuse detracts from her credibility." (Tr.

19.) Particularly relevant to the ALJ's credibility assessment are the cited inconsistencies between the medical evidence, Plaintiff's hearing testimony, and her various reports and statements to medical providers about her use or non-use of drugs or alcohol. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record," including statements made by the claimant at each prior step of the administrative review process. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *5 (S.S.A. 1996).

In assessing credibility, the ALJ also appropriately considered the findings of Kenneth Hobby, Ph.D., that Plaintiff was malingering[5] about having hallucinations and "may be minimizing drug use." (Tr. 19, 180, 183.) *See Gonzalez v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (proper to discredit complaints where medical providers noted that claimant exhibited signs of symptom exaggeration and malingering); *Clay v. Barnhart*, 417 F.3d 922, 930 & n.2 (8th Cir. 2005) (medical providers' concerns about malingering and minimal effort in testing cast suspicion on claimant's motivations and credibility). Dr. Hobby, a psychologist, examined Plaintiff on November 15, 2005, and prepared a report evaluating her mental status and adaptive functioning. (Tr. 174-84.) In their interview, Plaintiff denied current psychoactive substance use but admitted to such use "a couple of years ago." (Tr. 177.) Dr. Hobby's diagnoses were malingering hallucinations, rule out substance abuse, and borderline and antisocial personality traits. (Tr. 178, 180.) He found that she had the

[5]Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding work or obtaining financial compensation. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 739 (4th ed., Text Rev. 2000).

ability to understand, carry out and remember instructions, had a good capacity to respond to supervision, was able to respond appropriately to coworkers, and would probably respond adequately to work pressure in a work setting if she could physically do the work. (Tr. 184.) Although Dr. Hobby said he personally observed no significant physical limitations that would interfere with her adaptive functioning, he stated that the most likely area of difficulty for Plaintiff in a work setting would be her reported physical problems. (Tr. 175, 182, 184.) However, he said he was unable to "place much credibility in her report." (Tr. 183.)

The record also supports the ALJ's decision to discredit Plaintiff's allegations of disabling pain and other symptoms due to the extent of her daily activities. As noted by the ALJ (Tr. 17, 19), Plaintiff reported the ability to care for a disabled child, prepare meals, do cleaning and laundry, shop for groceries, read, and visit with others, and there was no evidence of an inability to function outside highly supportive living arrangements. (*See* Tr. 66-70, 78-82, 92-96, 182, 522-23, 532-33.) *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (no error in discounting credibility where self-reported limitations were inconsistent with medical evidence and daily activities, including housework, caring for child, cooking and driving); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for eleven-year-old child, driving, fixing simple meals, doing housework, and shopping for groceries held to be "extensive daily activities" that did not support claimant's alleged inability to work); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (claimant's total disability allegation was inconsistent with her daily living activities, including the care of her special needs children, bill paying, laundry, and cooking).

Plaintiff was also able to work steadily as a CNA for a number of years despite her medical conditions. (Tr. 522.) She said she was diagnosed with diabetes when she was seventeen (Tr. 522), began experiencing unusual fatigue when she was as young as sixteen (Tr. 74, 76, 101), had been having back problems since her first pregnancy in 1997 (Tr. 526), and had been experiencing tingling in her feet for five years prior to 2004 (Tr. 139). The ALJ found that she had never experienced episodes of deterioration or decompensation in a work-like setting (Tr. 17), and Plaintiff stated, at different times, that she was fired from her CNA job (Tr. 159) or that she quit because her boss suggested she try to get disability (Tr. 176). Her ability to work with her symptoms and medical conditions, as well as her ability to live independently and care for her children and home, undermine Plaintiff's assertions that she was unable to work during the relevant time period due to disabling fatigue, the need for frequent breaks and absences, and an inability to stand for more than fifteen minutes. *See Goff*, 421 F.3d at 792-93 (claimant's ability to work in the past with alleged impairments demonstrates they are not presently disabling; relevant factor is whether claimant leaves work for reasons other than medical condition); *see also Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [claimant's] heart condition is fatiguing, it is whether his fatigue is disabling.").

The ALJ's credibility analysis substantively and adequately covered the relevant considerations, and he provided good reasons supported by substantial evidence for not fully accepting Plaintiff's subjective complaints. *Samons v. Astrue*, 497 F.3d 813, 821 (8th Cir. 2007). While there is evidence in the record both supporting and detracting from the ALJ's conclusion that Plaintiff was not credible, the ALJ was able to observe Plaintiff during her testimony at the hearing and this, in addition to the significant amount of medical

evidence in the record, convinced the ALJ that she was not fully credible and could perform medium work. Under these circumstances, the ALJ was in the best position to make a credibility determination, and the Court will defer to that determination. *See Steed*, 524 F.3d at 876.

V.

Plaintiff also argues that the ALJ erred in failing to properly consider the opinion of Dr. Williams, who treated Plaintiff from June to December 2006. In a letter dated June 29, 2007, Dr. Williams stated that, because of Plaintiff's uncontrolled diabetes and related neuropathy and gastroparesis, she "likely will not be able to maintain employment due to frequent absences." Dr. Williams noted Plaintiff's several hospitalizations for diabetic ketoacidosis and said "[t]his should qualify her for disability." (Tr. 516.)

Dr. Williams' letter was submitted after the administrative hearing and appears to have been submitted only to the Appeals Council. (Tr. 4, 8.) In determining on judicial review whether the Commissioner's decision is supported by substantial evidence, the Court must consider all evidence in the record as a whole, including any new evidence considered by the Appeals Council. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008). Therefore, the substantial-evidence inquiry requires this Court to review Dr. Williams' letter in light of the rest of the record.

A treating source's opinion regarding "the nature and severity" of a claimant's condition is entitled to "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2); *see Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008). However, a treating physician's medical opinion may be discounted, or even disregarded, where other medical assessments are supported by better or more thorough medical evidence, or where the physician's opinion is internally inconsistent or inconsistent with the rest of the medical record. *Id.* at 798-99. Additionally, a treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination. *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007).

As stated, Dr. Williams treated Plaintiff only from June 2006 to December 2006, and her opinion thus has no relevance to Plaintiff's condition from her alleged onset date of February 1, 2004, until then. Additionally, Dr. Williams points to no clinical or laboratory findings supporting her opinion, and none of her treatment notes appear to place any limitations on Plaintiff's activities. Furthermore, Dr. Williams' opinion does not account for the fact that Plaintiff continually failed to comply with treatment and medication instructions during the relevant time period. *See Owen*, 551 F.3d at 800 (claimant's noncompliance is inconsistent with treating physician's medical opinion that fails to account for the noncompliance).

Therefore, the Commissioner did not err in failing to give controlling weight to Dr. Williams' opinion that Plaintiff was disabled due to her diabetes.

Plaintiff also broadly states that the "opinions and findings of the primary treating physicians clearly support" her subjective allegations and that the ALJ presented no medical evidence to contradict the opinions of "any of [Plaintiff's] treating physicians" (doc. 9, at 11). The only specifically referenced opinion is that of Dr. Williams, discussed above.

Plaintiff identifies no other treating physician opinion finding her unable to perform any work-related activities or assessing the extent of any functional limitations. Furthermore, the ALJ stated that he had considered opinion evidence in accordance with the relevant regulations and rulings (Tr. 17), and he specifically referenced and discussed findings by several treating hospital physicians, consulting and treating mental health professionals, and the state agency medical consultants (Tr. 18-19).

It is the ALJ's job to weigh the relevant medical opinions and to resolve any conflicts among the various treating and examining physicians. *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006). However, an ALJ is "not required to discuss every piece of evidence submitted," and his failure to cite particular findings from a medical opinion does not mean they were not considered. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). The Court cannot find that the ALJ erred in evaluating the medical findings in this case.

VI.

Plaintiff's remaining argument is that the ALJ erred in finding she had the RFC to perform her past work as a CNA because he disregarded the vocational expert's testimony that, if Plaintiff were as limited as she alleges, she would be unable to perform any job. (*See* Tr. 538-39, 542-43.)

RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), (b) & (c), 416.945(a)(1), (b) & (c). The ALJ bears the final responsibility for assessing a claimant's RFC at step four of the sequential evaluation, based on all relevant evidence, including medical records, observations of treating physicians and

others, and the claimant's own descriptions of his limitations. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 416.927(e)(2), 416.945(a)(3).

Here, the ALJ found that Plaintiff had the RFC to perform medium work activity,[6] with some limitations in the domains of social functioning and concentration, persistence, and pace, given the evidence of her mental health treatment. (Tr. 17.) In reaching this assessment, the ALJ discussed Plaintiff's subjective allegations and the medical evidence as set forth above. (Tr. 17-19.) The ALJ also stated he had considered the vocational expert's testimony that an individual with the vocational profile and limitations outlined in his RFC could perform Plaintiff's past work as a CNA and numerous other jobs at the medium level or less. (Tr. 20, 538-40.)

At the fourth step of the sequential evaluation, the ALJ, while not required to do so, may consider a vocational expert's testimony in determining whether a claimant can perform her past work. *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008); *Banks v. Massanari*, 258 F.3d 820, 827-29 (8th Cir. 2001); 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) (vocational expert "may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy").

---

[6] As defined by the regulations and rulings, medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of up to twenty-five pounds, and standing or walking, off and on, for approximately six hours in an eight-hour workday. 20 C.F.R. §§ 404.1567(c), 416.967(c); Soc. Sec. Rul. 83-10, 1983 WL 31251, *6 (S.S.A. 1983).

The record as a whole contains substantial evidence to support the ALJ's RFC assessment. Furthermore, having properly rejected Plaintiff's subjective allegations regarding the extent of her limitations, nothing required the ALJ to rely on the vocational expert's testimony about an individual with those limitations.

VII.

After a careful review of the evidence and all arguments presented, the Court finds that Plaintiff's arguments for reversal are without merit and that the record as a whole contains substantial evidence upon which the ALJ could rely in reaching his decision.

ACCORDINGLY, the final decision of the Commissioner is **affirmed** and Plaintiff's case is **dismissed** with prejudice.

IT IS SO ORDERED this 31st day of March, 2009.

UNITED STATES MAGISTRATE JUDGE